Next up will be United States v. William Corrigan, case number 17-3642. I have both of my hearing aids in today. I don't always wear them both. Since God is off the table, we can go back to normal things. I guess that was pretty interesting. I was fascinated. Mr. Clovelly. Thank you very much. May it please this Honorable Court. I represent William Corrigan. I don't normally talk about the clients, but he is currently 66 years old. And until this case, he had a totally unblemished record. He's got a master's degree from the University of Chicago in business. Was once one of IBM's brightest stars. He incorporated ECS, a brand new technology company, in 2006 and went into effect in 2007. The second officer was a technological person named Gabriel Vlad. He owned about 20 patents. And the third board member represented another person who had some patents. That was Mr. Yarmy. Well, my client, during the three or four years he was associated with ECS, his job was to work with the investors and try to sell the company. Vlad worked with the engineers, and he and the engineers developed a prototype, which was quite valuable. They had a 40-page prospectus that they showed investors, and it was all about replacing copper wire with fiber optics. So if you put it on an airplane, it's going to be hundreds of pounds lighter. And it was considered to be, as one of these victims said, a very interesting concept. Which one was making 50,000 a year? My client, the president. Okay, and were there other employees? He was the only employee. So what's this issue? I mean, we're talking about a question of employee insurance. The engineers were contract engineers. They worked for one of Vlad's companies called Digital Testing. ECS paid their health care. And Vlad was the one that was in charge of them. Would that mean paying the health care issue? That's where the problem came up here. Well, that's what the district court judge thought, but we don't see it that way. Because, you know, when you start talking about selling stock, and you walk in with your prospectus to a potential investor, you don't start saying, by the way, we're paying Bill 50,000 a month, and we've got 10,000 a month in health insurance. You don't talk about expenses. You talk about the value of the patents. And in this case, all of these investments by these two alleged victims, their first investments, Duncan's was $325,000, and the other gentleman's was $125,000. They were both made after they saw the prototype. The prototype was flown out to Colorado for the one gentleman, and the gentleman from Wisconsin came into Illinois and viewed the prototype here. What is a prototype? A working model of how you can fly an airplane using fiber optics instead of copper wires. So this is actually an airplane was the prototype using this? That was the first use, but the prospectus had other military uses also. Anything that would lighten the load by replacing copper wire. Anyway, that's what sold these people, not the fact that there were expenses. And why would you bore somebody with how much money you're making or how you're going to spend the money? They needed the money. Now, my client sold over 160 different people shares of stock, and these are the only two which are claimed to be fraudulent. And he sold like 40 of them after these. So what is special about these? Well, they were in a cash crunch. There was a memorandum of understanding with an individual to sell ECS, the company, from December of 07. Fifteen months later in March of 09, that sale had still not consummated because they couldn't get funding for the collateral that that person put up, which was a gold mine. So my client was running all over the place and then got permission to go to Europe, which is where some of this money was shown by me to be spent, Antwerp, Brussels, and Kiev, talking to people to try to sell this. So they needed the money. They needed it badly. And for these investors to say, we didn't care about the stock. We were more interested in the fact that money was going to be used for health insurance it doesn't wash. But let me move into the legal issue, if I might. To me, where the district judge was wrong is he feels that when you deceive somebody, it's the same as defrauding somebody. And he uses the word, well, they were deceived because he didn't spend the money the way he said he was going to spend it. But how he said he was going to spend the money did not go to the essential nature of the bargain, which is we're going to sell you the stock at half price. These are the only two purchases out of all 160-some that were for half price. What was the cost of the 160? What did they pay? $250 a share. And these gentlemen had paid $250 a share for their initial investments. But the $50,000 they each put up was at $125 a share. So they got twice as much stock. And it was because they were in such desperate financial straits. How many shares did they supposedly get? Well, I have to stop.  400 shares for the $50,000. Now, my client had 5,000 shares. And he was owed $2 million. Nobody wanted to see UCS succeed more than my client. He did everything he could to make this company work. Now, I think the law in this case is important because, as I say, I believe the district court judge simply relied on some overture dicta in cases like FARD where they say, well, you don't have to have loss, actual loss. But you do, if you look at the New York cases, or I should say the Second Circuit cases, you do have to have an intent to defraud. That comes from the neater opinion. You have to have a specific intent to defraud, not just talk about we got the best product or something that you would expect a salesperson to say, something that goes to the essential nature of the bargain. So I'd like to talk about a couple of situations to just show how the district judge misled himself. The Leahy case was a case where vendors got a big contract with the city of Chicago. And they argued, well, we performed the contract. They got everything that we told them they would give them. They didn't lose any money. We fairly dealt with the contract. But the essential nature of that bargain was in order to get that contract, they had to have a minority ownership. So they lied by saying, we've got a minority owner. They paid some guy to say he was a partial owner. And that was a lie. And it went to the essential nature of the bargain. So when Leahy is used to say, well, you didn't have to have any loss or anything, well, that's beside the point. They would never have gotten the contract if they hadn't lied about having minority ownership. The same thing with mortgages and loans to banks. When you give information that inflates your income and your assets, you never would have gotten that loan. You never would have gotten that mortgage. It doesn't matter if there was no intent for a loss. You're reading too much into it. And so the definition of material is everything here. Because the Nieder case uses civil case law from the restatement of torts and contract. But then they make it specific, and they talk about would the concealment of information or the misrepresentation be significant to the relevant decision maker and cause them to change their mind. And if you've already got a lot of stock in this company and you believe in the technology, which both of them said they did, and both victims said they did their due diligence and they liked the concept, then when you're buying that stock, you're not buying it because they owe money to an insurance company or they're having trouble paying salaries. You're buying it because you like the product. The essential nature of the bargain is you're getting stock that you feel is valuable. And at that point in time, it was felt to be valuable. It would have been all right if he said, we need money not to pay off somebody's health insurance, but maybe to pay his salary or maybe to stay straight up, whatever they're going to use the money for. Travel to Europe or do something for business, not to see somebody. Well, I'm sorry, Judge. In my view, you don't make economic decisions on the basis of... I mean, if you're getting a loan from a bank, you don't generally look at the balance sheet and see how well they're doing. The bank does. Yes, but the individual person doesn't care. Don't compare it to borrowing from a bank. You know, they don't say, oh, yeah, you're a good guy, you have the money. No, they're going to have to... When you're talking about investing that kind of money, the bank... Now, you can make a case, I think, at least that's what you're trying to do, to say, well, they were talking about health insurance. And this was a good reason to come up with that money. It was not a good reason, Judge. It was just one of the many expenses that he didn't detail. I mean, he didn't say, well, we're being sued, you know. He didn't say, I'm living in the other officer's basement. That would be embarrassing. He only said what was... He said some things that maybe he shouldn't have, but it didn't impact the essential element of the bargain, which is the sale of the stock. And the stock had the value that was shown in the prospectus. So he gave... So, you know, there's a half price. Wasn't that the question? You can have this stock for half price or something? They bought the stock for half price. They obviously knew the stock was in trouble. Do they have that stock? They still have that stock. And it may still be valuable. I attached some information to my sentencing memorandum showing that the stock may be purchased by another company. I don't know what the current situation is. Now, I haven't argued the indictment, but in my opinion, the gentleman from Wisconsin was never... There was no count that named him by the grand jury. And it was only after the government amended it and added his name to count one that Neelitz, the person from Wisconsin, became a victim in the case. And so we feel the only viable count of conviction should be the one involving Duncan, as he was named in all four counts by the grand jury. And we feel that changing the name of the victim is something only a grand jury can do. Thank you. Thank you. Mr. Stetler. May it please the court, my name is Chris Stetler and I represent the United States. Your Honors, here the district court properly concluded that the defendant intended to defraud his victims, Mr. Neelitz and Mr. Duncan, as a representative of Rahway Partners, and that also the defendant's misrepresentations, several of them, were material. Each victim in the district court's view credibly testified that he would not have invested had he known the truth. And each investor went into somewhat detail in talking about why the victim would not have invested those funds. This was a defendant who at the time he solicited the funds from the investors, knew that they had already invested significant amounts of money, $350,000 by Rahway Partners, $125,000 by Mr. Neelitz, and he reached out to them and he gave them a series of lies. He said that, first of all, the company was on the verge of losing its health insurance when, in fact, the company had already lost its health insurance. He talked about how he was going to use the money to pay for the health insurance when, in fact, the day immediately before sending the first solicitation, he was communicating with a romantic interest about how he was planning to use at least some of those funds to send to her and how he wanted to travel to visit her. He also misled the investors in terms of where their money was being sent. The wiring instructions referred to both the defendant and to ECS. The stock subscription agreements referred to the money being sent to ECS. And then after the defendant received the funds from the investors, he used it for personal use, a significant portion of it, and then tried to conceal his actions by telling the investors multiple times that he had actually spent the money for the health insurance. And each investor, in the district court's view, credibly testified that he would not have invested that money either because he knew that the money was being sent to the defendant's personal account or if the investor knew that the defendant would spend the investor money on personal expenses, which he did. Mr. Chadler, can you address the compensation of money not solicited under the Wire Fraud Scheme, whether or not that fits within the Restitution Act? I'm sorry. The Restitution Act itself has requirements with regard to what would be counted for purposes of the restitution. What about money that was not solicited under the scheme, the Wire Fraud Scheme? Can that be included or not? I don't believe so, Judge. I think the restitution would cover the amount of harm caused by the illegal act, and here it would be three separate investments that were made under the false pretense of the defendant. First of all, accepting money into ECS's account, and second of all, using that money very specifically for the health insurance. Okay, thank you. Judge, very quickly on the issue of the indictment, I essentially messed up on the indictment multiple times, both below and in this court, and I apologize for that. I think at the end of the day, however, there was no prejudice by what was done. It was very clear throughout the indictment that Mr. Nielitz and Mr. Duncan were both referred to as victims. It was clear in docket entry 99 that we submitted below that the grand jury actually meant to refer to, in count one, Mr. Nielitz. There was one email that was referred to in that count that included specific quotations that only was included in an email to Mr. Nielitz. There was only one exhibit that was sent on March 22, 2009. That was the email to Mr. Nielitz. When that exhibit was offered into evidence, there was no objection, and I have not seen any evidence of prejudice because of that error. Unless there are any questions, I would ask the court to affirm the conviction and sentence. Thank you, Mr. Statler. Mr. Clavelli. I'll only briefly address the last comment that was made. It is true the March 22 email was sent to Nielitz, but I mean when you name Duncan as the victim in that count, and the facts between Duncan and Nielitz, they're on the same dates. There are many emails between March 22 and March 30, and then there are more emails in mid-April. So to say that the grand jury meant to charge Nielitz, I just don't think this court can change. I think that's an essential element of the name of the victim because if Nielitz is not a victim, then, for instance, on the restitution, it's cut in half. Instead of $100,000, it should be $50,000. You know, I want to say once again, the government says the judge found that Corrigan defrauded these victims. He uses the word deceive, and the Second Circuit in several cases that are cited in my brief distinguishes between deceiving somebody and defrauding them. It's all right to deceive somebody because you may want to get something. As long as you don't defraud them, too. I beg your pardon? As long as the deceit is not designed to defraud. Exactly, because you're defrauding them when you know, if you had told them this particular fact, they wouldn't complete the bargain. But when you say, oh, you know, our paper is the best paper on the market, well, everybody knows that's puffing, as long as you're giving them, you know, top flight. This is in the region supply case that I cited. As long as everything you tell them about the price and everything is fair and accurate, and they wouldn't have made the purchases anyway, the fact that you said it's the best stuff on the market, well, that doesn't really resonate. Everybody says stuff like that. You know, Ford is better than Chevy. I mean, really, you're not going to sue Ford because somebody thinks Chevy is better than Ford, and that's actually what we're dealing with here. So none of the reason that I say the indictment is insufficient is the same reason that the proof is insufficient. None of these misrepresentations goes to the value or the essential nature of the bargain. Thank you very much. Thank you, Mr. Covelli. The case will be taken under advisement.